WELLMAN v. TIGER OIL CO.

1. FRAUDULENT CONVEYANCES—INSOLVENCY—ASSETS—LEASEHOLD.
   Insolvent corporation may not give away its assets, including leasehold which may be valuable asset.

2. SAME—SURRENDER OF LEASEHOLD—FRAUD.
   Surrender of leasehold by insolvent corporation which was unable to pay rent or continue in business because of lack of credit was not in fraud of rights of judgment creditor, where latter was informed of conditions, notified that lease was about to be canceled, given opportunity to obtain it at small cost, and there was no evidence of any fraud in transaction resulting in making of new lease to another party in whose hands it proved to be valuable.

Appeal from Oakland; Covert (Frank L.), J. Submitted January 19, 1932. (Docket No. 117, Calendar No. 36,031.) Decided June 6, 1932. Rehearing denied September 14, 1932.

Bill in aid of execution by Ernest L. Wellman, doing business as Wellman Oil Company, against Tiger Oil Company, a Michigan corporation, and others. Decree for plaintiff. Defendant Quality Oil Company appeals. Reversed, and bill dismissed.

*George A. Cram* and *Clare J. Hall,* for plaintiff.

*Nathaniel H. Goldstick* and *Paul H. Wieselberg,* for defendant Quality Oil Company.

BUTZEL, J. On June 16, 1925, Slater Construction Company, as lessor and owner, leased lot 17, Comstock & Paddock's Addition to city of Pontiac, to Roy L. Francis, as lessee, for a term of five years, at a rental of $100 per month. The premises were

to be used as an oil station.  Francis assigned the
lease to the Tiger Oil Company, a corporation in
which he, his son, and his attorney owned the capital
stock of $24,000; $1,040 of this amount was paid in
cash and the balance in property, which included
the lease at a valuation of $2,000.  On July 20, 1927,
the Slater Construction Company leased an adjoin-
ing lot to Francis at $125 per month.  Although the
lease ran to Francis, it was considered as belonging
to the Tiger Oil Company.  It provided that it and
the former lease might, on due notice, be renewed
for a period of five years from June 10, 1930, at a
rental of $400 per month for both lots.  In June,
1927, the Tiger Oil Company opened another oil
station in Pontiac under a lease from one Esch.  It
also purchased on land contract a parcel of property
for a car washing station.  The Tiger Oil Company,
on July 9, 1927, borrowed $4,400 from David Ham-
mond, giving as security a chattel mortgage on all
fixtures, equipment, supplies, stock on hand, and
after-acquired property, at its various stations.  On
June 27, 1928, $1,600 still remained unpaid on the
mortgage.  The Tiger Oil Company prospered for
but a brief period.  In the first year of its business,
it showed a deficit of $6,312.14.  It seemed to fare
better in 1927, and through auditors, who took the
figures of an appraisal company, who in turn were
advised by Francis, an entry was made on the books
showing the valuation of the leasehold to be
$62,871.28.  This figure was arrived at by attempt-
ing to capitalize the profits that the company antic-
ipated making during the remaining years of the
term, at $15,000 per year.  As a matter of fact, no
such profits were ever made; the business was an
unprofitable venture.  The account did show a profit
of $11,298.50 for the year 1927, but in the operating

statement for the year, it is not shown whether $6,123.59 due for gasoline taxes was charged against profit or not. This sum was not paid and appears in the liabilities at the end of the year. On December 31, 1927, the company had $212.32 cash on hand and other current assets of $6,474.07. The current liabilities amounted to $24,070.07. This included a bank overdraft of $841.62 and unpaid gasoline taxes amounting to $6,123.59. The balance sheet of April 30, 1928, shows a net operating loss of $4,984 for the four months. This does not include $1,360.37 lost through the sale of the property on which the station for washing cars was located. The sales showed a very substantial increase during 1928, and reached 143,667 gallons in June, but immediately declined, so that the sales in August were only 46,005 gallons. The fact that the company did a cut-rate oil and gas business, it is claimed, accounts for the large amount of its sales for a period. Towards the end of August, the company owed the State of Michigan $17,589.36 for gasoline taxes, which, with penalties, amounted to over $25,000. Slater claims that there was a default in the payment of rent. The company had received notice of cancellation of the Esch lease. It was unable to purchase gasoline and oil in order to continue, and the business had come to a standstill. Francis and the other owners regarded their stock as worthless, and transferred it without consideration to a party by the name of Marshall, who turned it over to others.

The litigation in the present case arises out of transactions that took place on or about August 15, 1928, and shortly thereafter. Slater, one of the owners of the properties, with whom all the dealings were had, testified to the following facts: He made an examination of the condition of the property,

and, on finding that it was not being operated by any one, took possession. The attorney for Ernest L. Wellman, doing business as the Wellman Oil Company, the plaintiff herein, had spoken to him about the lease, and informed him that Wellman had a large claim against Francis. Slater told the attorney the lease was in default and that he intended to cancel it. The attorney told him not to, as Wellman had spoken of taking over the property. Slater then offered it to him first for $350 or $400, but the offer was not accepted. Slater further testified that he made a new lease to one David Holbrook, but a day or two before doing so, he called up plaintiff's office and again asked if it would put up $400 or $500 for a lease, and a Mr. Campbell, in charge of plaintiff's office, said that it would not, as it did not have any money. It was after the refusal of plaintiff to take the lease that a new one was made with Holbrook for a $300 consideration. Slater further testified that three or four men, some of whom had assignments, were after the lease, but he refused to honor the assignments and stated that he was going to cancel and wipe out the old lease and make a new one. Before giving a new lease, Slater demanded a cancellation of the old lease. Such a document, signed by the Tiger Oil Company by "A. Marshall, President, sole owners of all capital stock of above-named corporation," and by Roy L. Francis, was delivered to Slater on August 21, 1928. On the following day, the Slater Construction Company, in consideration of the sum of $300 paid to it, made the new lease to Holbrook, who on September 5, 1928, assigned it to the Quality Oil Company, another corporation that had just been organized for the purpose of carrying on an oil business and with a capital of $5,000, of which $2,200 was paid in. The new lease was for a

term of one year and nine and one-half months, the balance of the term under the old lease, at $225 per month, with the privilege of an extension for a further term of five years at $400 per month, as provided in the old lease. It contained a clause requiring lessee to save lessor harmless from all claims or liabilities arising out of the old lease, and to pay all legal expenses for any litigation resulting therefrom. Slater testified that this clause was inserted because he feared that some difficulty might arise through claims of the State on account of the unpaid gasoline taxes. The organization of the Quality Oil Company was brought about through Holbrook or his brother. It obtained a retail gasoline dealer's license and spent a large sum of money on the premises. The Hammond chattel mortgage was foreclosed, and the personal property was bid in and sold to one Robert Savage, who transferred it to the Quality Oil Company. We are in accord with the opinion of the trial judge in holding that the foreclosure sale was regular. He also found that the personal property covered by the mortgage was of little or no value at the present time. Plaintiff has not appealed from this decision of the trial judge, so that we need only discuss the transfer of the lease.

The Quality Oil Company, in order to secure purchases of oil from the Fisher Industries, gave it a chattel mortgage on its assets for $5,000. The Fisher Industries desired to acquire the property of the Quality Oil Company, and agreed to pay $15,000 for it. From this sum there was deducted almost $4,000 due from the Quality Oil Company to the Fisher Industries, and the balance was paid in monthly instalments to the stockholders of Quality Oil Company, the transfer being effected through transfers of shares of stock and not of assets. The following

year the Quality Oil Company, with its new stock-
holders, secured a new 10-year lease from the Slater
Construction Company. Between $7,500 and $10,000
was spent on improvements, a large bank balance
was carried, and the business flourished. On Sep-
tember 18, 1928, the Wellman Oil Company, which
had two opportunities to purchase the lease from
the Slater Construction Company for a small
amount, sued out a writ of attachment against the
Tiger Oil Company. The sheriff levied on the for-
mer equipment of the Tiger Oil Company and also
on the leasehold interest under the Slater lease.
Subsequently, it obtained a judgment for $7,055.15
against the Tiger Oil Company for gasoline and oil
furnished the latter company. Ernest Wellman,
who does business under the name of Wellman Oil
Company, on April 8, 1929, filed a bill of complaint,
in the instant case, in aid of the attachment against
the Tiger Oil Company, Slater Construction Com-
pany, Quality Oil Company, David Hammond, and
other individuals who were parties to the various
transactions. Plaintiff claims that the Hammond
mortgage was a fraud on the creditors, and that the
new lease given by the Slater Construction Company
was a continuation of the old lease and by a subter-
fuge made to appear as if it were a new one. We
have already discussed the mortgage and the dis-
posal of the personal property.

We agree that the surrendering of the old lease
and the giving of a new one created an atmosphere
that at first glance seems unfavorable to defend-
ants. It is elementary that an insolvent corpora-
tion may not give away its assets in fraud of its
creditors, and that a leasehold may be a valuable
asset. Whether it has any value or not, and the
existence or absence of fraud must be determined by

the varying facts in each case. We are not satisfied that there was either actual or constructive fraud in the present case. The lease had proven to be valueless, a possible liability and not an asset. The Tiger Oil Company was insolvent. It owed the State of Michigan a very large sum of money and was liable to severe penalties; it was hopelessly in debt; it had neither capital, merchandise, or credit with which to continue business; its business had come to a standstill. A large gallonage had been sold at the station at cut-rate prices, but evidently at a loss. There was nothing furtive or secret about the manner in which the new lease was made. Plaintiff knew about the condition and twice refused an opportunity to obtain it at a very small cost. It had been offered to others. One Schlee, who had been president and manager of a large oil company that operated 125 oil stations, five of which were in Pontiac, had made a very careful examination of the property and had been asked by Francis to take it over, and had received the same offer from him that Marshall accepted. Schlee stated that the property was of no value to his company as a gasoline station. The first lease had less than two years to run, with a privilege of a five-year extension at a higher rental. An officer of the Quality Oil Company, who conducted the negotiations for the purchase of stock for the Fisher Industries, testified that the property was not considered of any value for a gasoline station, but that it was purchased for the sale of fuel oil; that the Fisher Industries were the largest distributors of fuel oil for domestic purposes in Detroit and contemplated using the property ultimately for the sale of fuel oil. Although the new lease was traded in and considered of value very shortly after it was given, it required a period of

operation to demonstrate that the station could be made profitable. In a stipulation of additional facts, filed in the case, it was agreed that in the year following a successful operation of the property a profit in excess of plaintiff's claim had been realized through the use of the leasehold property. This may have been entirely due to the initiative, enterprise, and additional capital furnished by the new lessee. Slater Construction Company had difficulties in collecting its rent from an insolvent tenant. It had a right to make a new lease with a solvent one. It did it openly, and after giving plaintiff the first opportunity to secure the lease.

After a careful reading of the record, we are constrained to hold that there was no fraud shown, and the bill of complaint is dismissed, with costs to defendant.

CLARK, C. J., and McDONALD, POTTER, SHARPE, NORTH, FEAD, and WIEST, JJ., concurred.